# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| LINDA HENKEL, | ) | CASE NO. 1:17CV1202 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Linda Henkel, ("Plaintiff" or "Henkel"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423 *et seq.* ("Act").  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I.  PROCEDURAL HISTORY

In June 2014, Henkel filed an application for POD and DIB, alleging a disability onset date of December 30, 2013, and claiming she was disabled due to sarcoidosis, lung disease, degenerative disc disease, fibromyalgia, diabetes, high blood pressure, bipolar disorder, anxiety disorder, depression, sleep apnea, insomnia, arthritis, and foot neuropathy.  (Transcript ("Tr.") 211, 252.)  The applications were denied initially and upon reconsideration, and Henkel requested a hearing before an administrative law judge ("ALJ").  (Tr. 158, 168, 175.)

On February 26, 2016, an ALJ held a hearing, during which Henkel, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 37-101.)  On March 25, 2016, the ALJ issued a written decision finding Henkel was not disabled.  (Tr. 14-36.)  The ALJ's decision became final on April 26, 2017, when the Appeals Council declined further review.  (Tr. 1.)

On June 8, 2017, Henkel filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 14.)  Henkel  asserts the following assignments of error:

(1) Whether the ALJ's failure to consider the evidence and opinions from Plaintiff's medical team as a whole was in error and resulted in a residual functional capacity assessment that is not supported by substantial evidence.

(2) Whether the ALJ failed to properly evaluate and weigh the opinion of Ms. Henkel's treating psychiatrist.

(Doc. No. 13.)

# II.  EVIDENCE

## A.  Personal and Vocational Evidence

Henkel was born in November 1962 and was 53 years-old at the time of her

2

administrative hearing, making her an "individual closely approaching advanced age," under social security regulations. (Tr. 31.) *See* 20 C.F.R. §§ 404.1563(d). She has a high school education and is able to communicate in English. (*Id.*) She has past relevant work as a hair dresser (D.O.T. #332.271-018). (*Id.*)

**B.    Medical Evidence**[2]

**1.    Mental Impairments**

On January 11, 2013, Henkel underwent a psychiatric evaluation with nurse practitioner Amelia Polzella, NP, at the Centers for Families and Children. (Tr. 539.) Henkel described increased stress due to back problems and the death of her sister. (*Id.*) Ms. Polzella noted Henkel had no history of psychiatric hospitalizations and was "here to get previous [medications]." (Tr. 540, 544.) Ms. Polzella described Henkel as "resistive to change," "very fixed in her thoughts," and "nonreceptive to support." (Tr. 544.) Ms. Polzella discontinued Henkel's Adderall prescription, and prescribed Ativan and Zoloft. (*Id.*) She diagnosed Henkel with major depressive disorder and bereavement, with the differential diagnoses of attention deficit hyperactivity disorder ("ADHD"), rule out; and generalized anxiety disorder, rule out. (Tr. 545.) Ms. Polzella assessed a Global Assessment of Functioning ("GAF")[3] score of 50,

---

[2]    The Court notes its recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[3]    The GAF scale reports a clinician's assessment of an individual's overall level of functioning. An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

indicating serious symptoms.  (Tr. 546.)

Henkel returned to the Centers for Families and Children on April 15, 2013 for a medication management appointment with physician's assistant Deana Couture, PA.  (Tr. 551.) Henkel reported grief over her sister's death, and while she denied suicidal ideation, indicated she "wishes she was with her sister."  (*Id*.)  She described poor sleep, but her situational anxiety was managed with Ativan.  (*Id*.)  Henkel saw Ms. Couture again on May 15, 2013, who described a labile mood but controlled anxiety.  (Tr. 553.)

On July 23, 2013, Ms. Couture noted Henkel's mood swings had improved but her sleep was impacted by chronic pain.  (Tr. 558.)  On October 15, 2013, Ms. Couture noted Henkel was "doing well," as her depression and anxiety were stable.  (Tr. 560.)

Henkel saw Ms. Couture again on March 17, 2014 for medication refills.  She again was "doing well," with no current issues or concerns.  (Tr. 563.)  Her mood and anxiety were stable, though she continued to have poor sleep due to pain.  (*Id*.)  Henkel indicated she had run out of her medications in late January, so Ms. Couture re-started Zoloft and Ativan.  (Tr. 563, 564.)

On June 9, 2014, Henkel reported she was "struggling," due to her son's mental health issues.  (Tr. 565.)  She indicated she was spending her time in bed to avoid stressors and anxiety. (*Id*.)  Ms. Couture increased Henkel's Zoloft and Ativan dosages temporarily.  (Tr. 566.)  Henkel returned to Ms. Couture on August 6, 2014, reporting increased irritability, secondary to her back and shoulder pain.  (Tr. 697.)  She relayed she had been assisting her mother take care of her home.  (*Id*.)  Henkel indicated her mood was otherwise stable, with mild anxiety.  (*Id*.)

On July 17, 2014, case manager Brittney Smith, filled out a "Daily Activities

Questionnaire" prepared by the Social Security Administration.  (Tr. 271-272.)  In this

questionnaire, Ms. Smith noted the following:

- Henkel lives with her mother;

- She does not get along with others "because of stressful situations that people create;"

- She "sometimes isolates herself from others;"

- She had lost past employment because she "could not successfully complete task[s] due to anxiety, fear, and confusion," and "could not attend work due to physical limitation and illness;"

- Her "severe anxiety causes [frequent] sleeping problems which causes high needs for rest;"

- She has an "inability to manage stress appropriately," and was "suicidal in the past;"

- She has difficulty with food preparation, housework, and personal hygiene due to her physical limitations; and

- She is compliant in attending her appointments, and is working with a counselor "for dealing with stressors and family issues."

(*Id.*)

On November 3, 2014, Henkel returned to Ms. Polzella, with complaints of high levels of

anxiety and depression but no suicidal ideation.  (Tr. 699.)  She relayed her mother had recently

had a stroke, and she had been caring for her.  (*Id.*)  She indicated she was "burned out taking

care of everyone."  (*Id.*)  Henkel also reported she had lost 30 pounds, as a result of dancing and

walking for exercise.  (*Id.*)

On January 5, 2015, case manager Ashley Pavone, filled out a "Daily Activities

Questionnaire" prepared by the Social Security Administration.  (Tr. 282-283.)  In this

questionnaire, Ms. Pavone noted the following:

5

- Henkel lives with her mother but "often stays with [her] boyfriend;"

- She is often angry with her family members, and her relationships with them are strained;

- She visits with family and friends once a week;

- She has had confrontations with past employers, and "has a hard time getting along with others at work;"

- Due to Henkel's physical problems, "she needs to rest more than a work schedule allows;"

- She has social anxiety, and "becomes stressed/angry while working;"

- She depends upon her boyfriend and children to prepare her meals, provide transportation, and perform housework; and

- Her mother handles her personal finances.

(*Id*.)

On February 25, 2015, Henkel presented to psychiatrist James Bukuts, M.D.  (Tr. 705.) She indicated she was still grieving the death of her sister.  (*Id*.)  She also reported she had been on Adderall in the past, and wanted to restart this medication.  (*Id*.)  Dr. Bukuts declined to prescribe Adderall, and told Henkel she needed to address her anxiety issues first.  (Tr. 705, 706.) He noted Henkel was "very head strong to get back on stimulant that she was on in the past and needed a lot of redirection/education with the need to [treat] the primary [diagnosis] first."  (Tr. 706.)

On July 14, 2015, Henkel presented to nurse practitioner Elizabeth Petitt, NP, reporting compliance with her medications and no concerns.  (Tr. 762.)  She relayed she slept well most nights, was keeping busy, and her anxiety had improved.  (*Id*.)  Henkel returned to Ms. Petitt on November 12, 2015, reporting medication compliance and improved sleep.  (Tr. 768.)  She

6

described "situational episodes of feeling stressed," but she was "keeping busy" and staying

"active with her family."  (*Id.*)

On February 8, 2015, Ms. Petitt and Dr. Bukuts filled out a "Medical Source Statement:

Patient's Mental Capacity" form prepared by Henkel's attorney.  (Tr. 855-856.)  They opined

Henkel could frequently (up to 2/3 of the workday), perform the following activities:

- Maintain attention and concentration for extended periods of 2-hour segments;

- Deal with the public;

- Relate to co-workers;

- Interact with supervisors;

- Work in coordination with or proximity to others without being distracting;

- Maintain appearance;

- Behave in an emotionally stable manner; and

- Leave home on her own.

(*Id.*)  Ms. Petitt and Dr. Bukuts found Henkel could occasionally (up to 1/3 of the workday),

perform the following activities:

- Follow work rules;

- Use judgment;

- Respond appropriately to changes in routine settings;

- Maintain regular attendance and be punctual within customary tolerances;

- Function independently without redirection;

- Work in coordination with or proximity to others without being

7

distracted;

- Deal with work stress;

- Complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods;

- Understand, remember, and carry out simple, complex, and detailed job instructions;

- Socialize;

- Relate predictably in social situations; and

- Manage her funds and schedules.

(*Id.*)

## 2. Physical Impairments

On January 7, 2010, a MRI of Henkel's lumbar spine revealed a large left posterolateral herniation and inferior extrusion of the L5-S1 disc, with significant mass effect upon the left S1 nerve root.  (Tr. 668.)  Henkel subsequently underwent back surgery in April 2011.  (Tr. 303.)

On October 14, 2012, Henkel visited the emergency room, reporting increasing back pain after moving heavy boxes.  (*Id.*)  Her physical examination was normal.  (Tr. 304.)  The emergency room physicians prescribed Vicodin and advised her to follow up with her primary care doctor.  (*Id.*)

Henkel visited primary care physician Stephanie Sadlon, M.D., on October 23, 2012.  (Tr. 326.)  She reported acute back pain, which resulted in several visits to the emergency room.  (*Id.*)  On examination, she did not appear to be in pain and her straight leg raises were negative.  (Tr. 327.)  She had mild right-sided paraspinal tenderness.  (*Id.*)  A lumbar MRI revealed an increase in the amount of soft tissue abutting the left S1 nerve root on the L5-S1 level.  (Tr. 336.)  This

8

finding indicated either increased scar tissue, or scar tissue with a component of a herniated disc. (*Id*.)

On November 1, 2012, Henkel consulted with neurological surgeon Sean Nagel, M.D. (Tr. 631.)  On examination, Henkel had a normal sensation, no edema, and normal muscle bulk, strength, and tone.  (Tr. 633.)  Dr. Nagel reviewed the recent lumbar MRI, and interpreted it as possibly revealing a recurrent disc herniation.  (Tr. 634.)  He recommended Henkel attempt non-surgical treatment first, and referred her to pain management.  (*Id.*)

Henkel saw primary care physician Priya Pujara, M.D., on December 13, 2012.  (Tr. 342.) She reported her back pain was radiating into her left leg, and she was ambulating with a walker. (*Id*.)  Dr. Pujara prescribed Percocet and referred Henkel to pain management and physical therapy.  (Tr. 344.)  On December 26, 2012, Henkel returned to Dr. Sadlon, describing continued back pain.  (Tr. 354.)  She continued to use a walker for ambulation.  (*Id*.)  Dr. Sadlon noted Henkel's diabetes was uncontrolled, and recommended Henkel re-start her diabetes medications. (Tr. 355.)

On January 10, 2013, Henkel initially saw pain management doctor Brendan Astley, M.D., at MetroHealth.  (Tr. 374.)  She described pain radiating down her right leg, with some numbness in her foot.  (Tr. 370.)  She indicated she was "sometimes" using a walker or cane to ambulate and was still working.  (Tr. 374.)  On examination, she had tenderness in her paraspinal muscles and over her sacroiliac joint.  (Tr. 373.)  She had decreased sensory discrimination from her feet to mid-calf.  (*Id*.)  Her straight leg raises were negative.  (*Id*.)  Dr. Astley prescribed Neurontin and scheduled an epidural injection.  (Tr. 374.)

Henkel underwent a series of three lumbar epidural steroid injections on January 22,

9

2013, February 12, 2013, and May 3, 2013.  (Tr. 383, 389, 405.)  She followed up with Dr.

Astley on May 20, 2013, reporting good relief from the injections.  (Tr. 414.)  Dr. Astley refilled

her medications and recommended another injection in the future.  (Tr. 417.)

On July 29, 2013, Henkel saw nurse practitioner Eileen Coppola, CNP, at the

MetroHealth pain management practice.  (Tr. 422.)  On examination, her gait was normal and she

had full strength in her legs.  (*Id.*)  She had tenderness to palpation over her lower back.  (*Id.*)

Ms. Coppola renewed Henkel's prescriptions and scheduled another epidural injection.  (Tr.

424.)

Henkel visited Dr. Pujara on August 23, 2013, for a possible urinary tract infection.  (Tr.

431.)  She indicated she was "not doing well" since her sister passed away and found caring for

her mother and daughter stressful.  (*Id.*)  She also reported her sarcoidosis was flaring up.  (*Id.*)

Dr. Pujara prescribed Macrobid for Henkel's urinary symptoms.  (Tr. 432.)  Henkel followed up

with Dr. Pujara on September 11, 2013, indicating her urinary symptoms had resolved.  (Tr.

445.)  She admitted she was not taking any medications for her diabetes and was experiencing

worsening neuropathy.  (*Id.*)  On examination, she had no edema and was not wheezing or in any

respiratory distress.  (Tr. 447.)  Dr. Pujara prescribed diabetes medications.  (Tr. 448.)

On October 8, 2013, Henkel underwent a lumbar epidural steroid injection.  (Tr. 455.)

On November 13, 2013, she followed up with nurse practitioner Todd Markowski, CNP, at the

MetroHealth pain management practice.  (Tr. 464.)  She indicated the epidural relieved her pain

by 50% for two weeks.  (*Id.*)

Henkel underwent another lumbar epidural steroid injection on December 3, 2013.  (Tr.

591.)  She followed up with pain management on January 13, 2014, this time treating with

10

Michael Jourden, M.D.  (Tr. 474.)  She reported her back pain was gradually worsening and radiating into her feet.  (*Id.*)  On examination, she had normal strength and sensation in her legs.  (Tr. 475.)  She had a mildly painful lumbar range of motion.  (*Id.*)  Dr. Jourden recommended a repeat injection.  (Tr. 477.)  She underwent this procedure on February 11, 2014, after which she was able to ambulate without difficulty.  (Tr. 495, 497.)

Henkel saw ophthalmologist Elisa Bala, M.D., on February 7, 2014.  (Tr. 488.)  Dr. Bala diagnosed early nuclear sclerotic cataracts.  (*Id.*)  However, these cataracts were not visually significant and no treatment was recommended.  (*Id.*)  On March 5, 2014, Henkel visited urgent care for a sinus infection and wheezing.  (Tr. 511.)  She received Zithromax for her symptoms.  (Tr. 512.)

On March 11, 2014, Henkel visited Eileen Coppola, CNP, at the MetroHealth pain management practice.  (Tr. 517.)  She described continuous, throbbing, aching pain.  (*Id.*)  Ms. Coppola prescribed Flexeril, Gabapentin, and Percocet.  (Tr. 520.)  Henkel returned to pain management on May 19, 2014, indicating sharp, dull, and intermittent pain, which was worse with sitting and standing.  (Tr. 571.)  On examination, Henkel had full strength in her upper and lower extremities.  (Tr. 572.)  She was tender in her lumbar spine, but there was no tenderness in her cervical or thoracic spine.  (*Id.*)

On July 15, 2014, chiropractor Bruce Morris, D.C., filled out a questionnaire prepared by the Social Security Administration.  (Tr. 667.)  He reported Henkel had (1) paresthesia and muscle spasm in her wrists and hands, (2) lower back, neck, and arm pain, and (3) radiculopathy into her left leg and foot.  (*Id.*)  He indicated she had diminished grip strength and decreased range of motion in her cervical and lumbar spines.  (*Id.*)  Dr. Morris reported Henkel could "use

11

her hands but for short periods of time then it starts to hurt, throb and ache." (*Id.*) He characterized Henkel's gait as "slow and deliberate," and noted she used a walker at times. (*Id.*) Dr. Morris indicated chiropractic treatment "reduces her pain level considerably and helps her to function." (*Id.*) Dr. Morris concluded Henkel was "not able to stand or sit for extended periods due to lumbar disc herniation . . . wrist and hands hurt due [to] carpal tunnel." (*Id.*)

Henkel visited rheumatologist Sobia Hassan, M.D., on January 9, 2015. (Tr. 741.) She indicated a right shoulder injection improved her pain for several months, but the pain recently returned after shoveling snow. (*Id.*) She described ongoing lower back pain and occasional shortness of breath. (Tr. 741, 742.) On examination, Henkel's right shoulder had a slightly reduced internal rotation and a positive impingement sign. (Tr. 744.) She also had skin lesions, which Dr. Hassan concluded were likely related to her sarcoidosis. (Tr. 745.) Dr. Hassan advised Henkel to see a pulmonary specialist and administered a right shoulder steroid injection. (*Id.*)

On January 13, 2015, Henkel visited Todd Markowski, CNP, for pain management. (Tr. 736.) On examination, she had tenderness in her lumbar spine and bilateral sacroiliac joints. (Tr. 738.) She had full strength in her upper and lower extremities. (*Id.*) Mr. Markowski increased Henkel's Percocet dosage, noting her blood sugar levels were too high for another lumbar epidural steroid injection. (*Id.*)

On January 15, 2015, Henkel visited primary care physician Constance Anani, M.D., for a viral upper respiratory infection. (Tr. 735.) She denied any wheezing or shortness of breath. (Tr. 734.)

Henkel returned to Mr. Markowski on February 24, 2015, reporting sharp, continuous

12

pain, radiating into her legs.  (Tr. 730.)  On examination, she had tenderness in her lumbar spine and sacroiliac joints.  (Tr. 731.)  She had a negative sit/slump test (i.e. a test used to document radiculopathy), and full strength in her upper and lower extremities.  (*Id.*)  Mr. Markowski again noted Henkel's blood sugar was too high for an injection.  (Tr. 732.)  On March 23, 2015, Henkel reported to Mr. Markowski she was "dancing a few times a week for exercise,"and was having pain radiating into her right buttock with forward flexion.  (Tr. 724.)  She had a positive sit/slump test on the right, and full strength in her upper and lower extremities.  (Tr. 727.)  Her blood sugars continued to be too high for an injection.  (Tr. 728.)

On April 16, 2015, Henkel visited nurse practitioner Tanja Kocher, CNP, for diabetes management.  (Tr. 719.)  She reported she walked for exercise and cut back on sugar in her diet.  (*Id.*)  She declined Lantus injections for her diabetes, indicating she would prefer to take pills.  (*Id.*)  Henkel also relayed her sarcoidosis was "acting up," as she was having trouble breathing and coughing.  (*Id.*)  Ms. Kocher noted Henkel's diabetes was poorly controlled and referred her for a nutrition consultation.  (Tr. 722.)

Henkel returned to Mr. Markowski on April 23, 2015, reporting dull and intermittent pain, without radiation into the extremities.  (Tr. 713.)  On examination, she had tenderness in her lumbar spine and sacroiliac joints, but full strength in her arms and legs.  (Tr. 716.)  On May 22, 2015, she again had full strength in her arms and legs, with tenderness in her cervical spine.  (Tr. 710.)  Mr. Markowski noted Henkel was "stable on [her] current regimen," and refilled her prescriptions.  (Tr. 711.)

Henkel returned to Mr. Markowski on June 22, 2015, reporting back spasms.  (Tr. 805.)  Mr. Markowski increased Henkel's Flexeril and noted she was "staying active, walking and

13

dancing." (Tr. 809.)  Henkel again reported back spasms on July 21, 2015.  (Tr. 800.)  At that time, she had pain with palpation in her lumbar spine.  (Tr. 802.)

On August 7, 2015, Henkel saw Dr. Astley for pain management.  (Tr. 795.)  She reported a recent fall and worsening pain.  (*Id*.)  Dr. Astley refilled her medications, and advised her she would likely need an injection soon.  (Tr. 798.)  On October 22, 2015, Henkel reported sharp pain radiating into her legs.  (Tr. 789.)  On examination, she had full strength in her arms and legs and tenderness in her lumbar spine and left sacroiliac joint.  (Tr. 792.)  She had no tenderness in her cervical or thoracic spines.  (*Id*.)

On November 11, 2015, Henkel visited with nurse practitioner Kelli Pittak, CNP, for a rash on her stomach.  (Tr. 786.)  Ms. Pittak noted Henkel had diabetes and had not been checking her blood sugars.  (*Id*.)  On examination, Henkel had a rash with discharge but no signs of ulcers or infection.  (Tr. 787.)  Ms. Pittak prescribed Nystatin powder.  (*Id*.)

On December 1, 2015, Henkel saw physician's assistant Albert Coreno, PA-C, for shortness of breath and a cough.  (Tr. 780.)  Henkel explained she had inhaled some smoke on Thanksgiving, which had exacerbated her sarcoidosis.  (*Id*.)  Mr. Coreno noted Henkel had not seen a pulmonologist in several years.  (*Id*.)  Henkel was wheezing on examination, prompting Mr. Coreno to prescribe steroids.  (Tr. 783,784.)

Henkel returned to Mr. Markowski for pain management on January 11, 2016.  (Tr. 773.)  She reported pain radiating into her right leg and foot, along with pain in her neck and right shoulder.  (*Id*.)  She indicated she wanted another epidural injection but would need to improve her blood sugars first.  (*Id*.)  On examination, she had full strength in her arms and legs and was able to abduct her shoulders to 135 degrees.  (Tr. 776.)  Mr. Markowski ordered a cervical spine

14

x-ray, which revealed degenerative disc disease.  (Tr. 777, 811.)

On February 1, 2016, Geepu Cahli Jani,[4] filled out a "Medical Source Statement:
Patient's Physical Capacity" prepared by Henkel's attorney.  (Tr. 853-854.)  This individual
found the following limitations for Henkel:

- She can occasionally lift and carry 5 pounds;

- She can stand and/or walk for a half hour during an 8-hour workday;

- She can sit for 1-2 hours during an 8-hour workday;

- She can rarely climb, balance, stoop, crouch, kneel, and crawl;

- She can occasionally reach, push, and pull;

- She can frequently perform fine and gross manipulation;

- She should avoid heights, moving machinery, temperature extremes, and pulmonary irritants;

- She has been prescribed a cane, walker, brace, TENS unit, breathing machine, and CPAP;

- She needs to alternate positions between sitting, standing, and walking at will;

- She experiences severe pain, which interferes with concentration, takes her off-task, and causes absenteeism;

- She needs to elevate her legs 45 degrees at will; and

- Additional limitations which would interfere with her ability to

---

[4]     The Court notes the signature on this form is not legible.  (Tr. 854.)  The ALJ, Henkel and the Commissioner refer to the individual completing this form as "Geepu Cahli Jani."  (*See* Doc. No. 13 at 10, Doc. No. 14 at 8, Tr. 29.).  No credentials are provided following the signature.  Both the ALJ and Henkel assert Geepu Cahli Jani is a physician.  Henkel further asserts Dr. Jani is a Metrohealth physician, though the MetroHealth medical records do not reference any treatment provider with this name.  (*See* Doc. No. 13 at 10.)

15

> work full time include "limited standing, limited sitting, limited
> walking, medication effects, confusion, and motion sickness."

(*Id.*)

On March 9, 2016, Henkel returned to Mr. Markowski, reporting continuous pain radiating into her arms.  (Tr. 860.)  She described numbness in her right hand and shoulder, and several falls since her most recent office visit.  (*Id.*)  On examination, she had tenderness in her cervical and lumbar spines, and a positive sit/slump test on the right.  (Tr. 865.)  She had full strength in her upper and lower extremities, and was able to abduct her shoulders to 135 degrees. (*Id.*)  Henkel continued to be unable to receive an injection due to her blood sugar levels.  (Tr. 860)  Mr. Markowski increased her Percocet dosage.  (Tr. 866.)

**C.    State Agency Reports**

**1.        Mental Impairments**

On October 11, 2014, Henkel underwent a consultative examination with Charles F. Misja, Ph.D.  (Tr. 687-694.)  She described pain, poor concentration, and anxiety.  (Tr. 688.)  She indicated she had been receiving counseling for the past 15 years due to depression, anxiety, and grief over her sister's recent death.  (Tr. 689.)  During the interview, Henkel was "quite friendly" with good eye contact.  (Tr. 690.)  She indicated a history of panic attacks, though Dr. Misja observed no manifestations of anxiety during the evaluation.  (*Id.*)  Dr. Misja estimated Henkel's intelligence to be in the average range.  (Tr. 691.)

Based upon this examination, Dr. Misja diagnosed Henkel with Major Depression and Generalized Anxiety Disorder.  (Tr. 691.)  He assigned her a GAF score of 55, indicating moderate symptoms.  (Tr. 692.)  Dr. Misja noted Henkel "was pleasant to interview and receives much support with her involvement at her church and she appears to have a reasonably good

support system there."  (*Id*.)  He then provided the following opinion regarding Henkel:

> **Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.**
> The claimant is a high school graduate and is a licensed cosmetologist.  She is probably functioning in the average range of intelligence and will be able to understand and implement ordinary instructions.
>
> **Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks**.
> The claimant reported no history of problems with learning or attention and none were demonstrated during the brief intellectual screening and interview.  Problems in this area are likely to be in the minimal range.
>
> **Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**
> She has no legal history and does not appear to have a personality disorder of any kind.  She stated she's never been fired from a job due to difficulties with authority issues.  Problems in this area are likely to be in the minimal range.
>
> **Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**
> The longest she's ever had a single job is 15 years and she's been a hairdresser for 25 years.  She stated that the only reason she's lost jobs is because she physically couldn't do the work required of her but otherwise enjoyed a long career doing hair.  Personal problems hindered her attendance but at the current time those problems appear to be minimal.  Problems in this area are likely to be in minimal range.

(Tr. 692-693.)

On October 21, 2014, state agency physician Aracelis Rivera, Psy.D., reviewed Henkel's medical records and completed a Psychiatric Review Technique ("PRT").  (Tr. 130.)  She concluded Henkel had (1) mild restrictions in activities of daily living; (2) mild difficulties in maintaining social functioning; (3) moderate difficulties in concentration, persistence, and pace; and (4) no episodes of decompensation.  (*Id.*)

On January 28, 2015, state agency physician Janet Souder, Psy.D., reviewed Henkel's

medical records and completed a PRT and a Mental Residual Functional Capacity ("RFC")

Assessment. (Tr. 147, 151-152.) She concluded Henkel had (1) mild restrictions in activities of

daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties

in concentration, persistence, and pace; and (4) no episodes of decompensation. (Tr. 147.) With

regard to Henkel's mental functional limitations, Dr. Souder found Henkel was not significantly

limited in her abilities to (1) maintain attention and concentration for extended periods; (2) ask

simple questions or request assistance; (3) accept instructions and respond appropriately to

criticism from supervisors; (4) maintain socially appropriate behavior and adhere to basic

standards of neatness and cleanliness; (5) be aware of normal hazards and take appropriate

precautions; (6) travel in unfamiliar places or use public transportation; and (7) set realistic goals

or make plans independently of others. (Tr. 151-152.) She found Henkel was moderately limited

in her abilities to (1) carry out detailed instructions; (2) complete a normal workday and

workweek without interruptions from psychologically based symptoms and perform at a

consistent pace without an unreasonable number and length of rest periods; (3) interact

appropriately with the general public; (4) get along with coworkers or peers without distracting

them or exhibiting behavioral extremes; and (5) respond appropriately to changes in the work

setting. (*Id.*) Dr. Souder found no evidence of any limitation in Henkel's abilities to (1) carry

out very short and simple instructions; (2) perform activities within a schedule, maintain regular

attendance, and be punctual within customary tolerances; (3) sustain an ordinary routine without

special supervision; (4) work in coordination with or in proximity to others without being

distracted by them; and (5) make simple work-related decisions. (*Id.*) Dr. Souder explained the

basis of her conclusions as follows:

18

[Claimant] can perform routine work in an environment without pressures from rapid pace or high productivity expectations.

Alleges problems interacting with others due to conditions, but is noted to interact appropriately at [consultative examination] and [treating source appointments]. [Claimant] can perform work involving superficial public/coworker interaction.

Claimant can perform work in a relatively static work environment with only minor and occasional changes.

(*Id.*)

### 2. Physical Impairments

On September 3, 2014, Henkel underwent a physical consultative examination with Khalid Darr, M.D. (Tr. 672-676.) She described back pain radiating into her legs, sarcoidosis, and diabetes. (Tr. 672.) She indicated she alternated between using a cane and wheeled walker to ambulate outdoors, but did not need an ambulatory aid indoors. (Tr. 672, 676.) She also reported some shortness of breath from her sarcoidosis. (Tr. 673.)

Upon examination, Henkel ambulated with a normal gait and appeared comfortable in the sitting and supine positions. (Tr. 674.) Dr. Darr noted "it is hard for her to even stand for any length of time or walk for any length of time due to low back pain." (*Id.*) She had no wheezing and was not short of breath on examination. (*Id.*) Her cervical spine examination was normal and her dorsolumbar spine had no tenderness or muscle spasm. (Tr. 675.) She did have a decreased range of motion in her dorsolumbar spine. (*Id.*) She had normal muscle strength in her upper and lower extremities and her sensation was intact. (*Id.*) She was able to walk on her heels and toes, but prolonged squatting increased her lower back pain. (*Id.*) Henkel underwent a pulmonary function study in connection with this consultative examination and the results were normal. (Tr. 686.)

19

Based upon this examination, Dr. Darr provided the following opinion:

> The claimant is able to push and pull objects and also can manipulate objects.  The claimant can operate hand control devices, but she would have a hard time with foot control devices.  The claimant is able to drive a motor vehicle and travel without any difficulty.  The claimant would have a hard time climbing stairs.

> Based upon this clinical evaluation, the claimant is able to carry and lift between 15 to 20 pounds frequently and over 20 pounds occasionally.  The claimant's activities of daily living and instrumental activities of daily living seem to be intact.

(Tr. 676.)

On September 11, 2014, state agency physician Maureen Gallagher, D.O., M.P.H., reviewed Henkel's medical records and completed a Physical RFC assessment.  (Tr. 131-133.) Dr. Gallagher determined Henkel could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday.  (Tr. 132.)  She further found Henkel could occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, and occasionally stoop, kneel, crouch, and crawl.  (*Id.*)  Dr. Gallagher concluded Henkel should avoid all exposure to heights, hazards, and commercial driving.  (Tr. 133.)  Dr. Gallagher noted this was an adoption of a prior August 14, 2012 ALJ decision.  (*Id.*)

On January 16, 2015, state agency physician Esberdado Villanueva, M.D., reviewed Henkel's medical records and adopted the findings of Dr. Gallagher.  (Tr. 149-151.)

**D.**     **Hearing Testimony**

During the February 26, 2016 hearing, Henkel testified to the following:

- She graduated high school.  (Tr. 47.)  She has a cosmetology license.  (*Id.*)  She previously worked as a hair dresser.  (Tr. 56.)  She lives with her mother in a one story home.  (Tr. 46.)  She does not "really help [her mom] too much."  (Tr. 76.)

20

Her son does her laundry and housework.  (Tr. 72.)  Her brother assists with the housework and caring for her mother.  (Tr. 76.)

- She prepares simple meals.  (Tr. 73.)  She goes out to eat.  (Tr. 80.)  She has friends with whom she regularly socializes.  (*Id*.)  She spends time with family on a regular basis.  (Tr. 83.)

- She cannot work due to constant pain.  (Tr. 58.)  This pain is located in her lower back, neck, legs, feet, and right shoulder.  (Tr. 59, 65.)  She is on multiple pain medications.  (Tr. 58.)  She has difficulty with concentration and reading comprehension due to her pain medications.  (Tr. 48.)  She occasionally experiences double vision due to her diabetes and her medications.  (Tr. 84.)

- She recently has been having difficulty driving due to neuropathy and right leg pain.  (Tr. 49.)  She has had repeated falls.  (Tr. 58.)  She attributes these falls to "muscle problems," weakness, and foot neuropathy.  (Tr. 63.)

- She has neuropathy in both feet due to her diabetes and her 2010 back surgery. (Tr. 67.)  She has developed problems with her right shoulder in the past year and a half.  (Tr. 68.)  She has difficulty reaching overhead.  (Tr. 70.)  She has some numbness in her fingertips.  (Tr. 72.)

- She cannot sit for extended periods.  (Tr. 60.)  She can stand for about 10 minutes and walk for 15-20 minutes due to back and leg pain.  (Tr. 69.)

- She has psychological problems for which she takes medication and receives counseling.  (Tr. 61-62.)  She experiences suicidal thoughts, hopelessness, and depression.  (*Id.*)

- She uses a cane and a walker to ambulate "when it gets really bad."  (Tr. 87.) Both devices were prescribed to her in 2013.  (*Id.*)  She uses her cane or walker a few times a week.  (Tr. 88.)

The VE testified Henkel had past work as a hair dresser (D.O.T. #332.271-018, light, skilled).  (Tr. 92.)  The ALJ then posed the following hypothetical question:

If you could please assume and[sic] individual of claimant's age, education, and work experience.  And assume that this individual can perform light[5]

---

[5]     "Light work" is defined as follows:  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category

21

> work – it says here meaning this individual can lift, carry, push, and pull 10
> pounds frequently, and 20 pounds occasionally in an eight hour work day,
> with normal breaks.  This individual can sit for six hours, and stand or walk
> about six hours, and this individual would require the ability to change
> positions briefly, that is one minute or less every 60 minutes.  This individual
> cannot work in a high concentration of dust, fumes, and gases, or extremes
> and cold, or high humidity.  This individual cannot climb ladders, ropes, or
> scaffolds, and is limited to occasional stooping.

(Tr. 92-93.)

The VE testified the hypothetical individual would not be able to perform Henkel's past

work as hairdresser.  (Tr. 93.)  The VE further explained the hypothetical individual would be

able to perform other representative jobs in the economy, such as office helper (D.O.T.

#239.567-010), ticket taker (D.O.T. #344.667-010), and mail sorter (D.O.T. #209.687-026).  (Tr.

94.)

The ALJ added the following limitations to her first hypothetical question:

> This individual with the hypothetical number one limitations on her abilities
> should not work in an environment requiring production rate pace, and can
> have occasional interaction with coworkers and the public, and is limited to
> occasional workplace changes.

(Tr. 95.)  The VE testified this hypothetical individual would be able to perform the mail sorter

position (D.O.T. #209.687-026), as well as other representative jobs in the economy, such as

garment sorter (D.O.T. #222.687-014) and laminator (D.O.T. #569.696-046).  (*Id.*)

---

> when it requires a good deal of walking or standing, or when it involves sitting
> most of the time with some pushing and pulling of arm or leg controls. To be
> considered capable of performing a full or wide range of light work, you must
> have the ability to do substantially all of these activities." 20 CFR § 404.1567(b).
> Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying
> requires being on one's feet up to two-thirds of a workday, the full range of light
> work requires standing or walking, off or on, for a total of approximately six
> hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the

23

claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Henkel was insured on her alleged disability onset date, December 30, 2013 and remained insured through June 30, 2016, her date last insured ("DLI.")  (Tr. 19.)  Therefore, in order to be entitled to POD and DIB, Henkel must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2016.

2.    The claimant has not engaged in substantial gainful activity since August 24, 2013,[6] the alleged onset date (20 CFR 404.1571 *et seq*.).

3.    The claimant has the following severe impairments: fibromyalgia, sarcoidosis, asthma, degenerative disc disease, osteoarthritis and allied disorders, obesity, neuropathy, affective disorders and anxiety disorders (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments

---

[6]    The Court notes the ALJ erroneously identified Henkel's alleged onset date as August 24, 2013. Henkel's actual alleged onset date of disability is December 30, 2013.  (Tr. 211.)

in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she requires the ability to change positions briefly, that is one minute or less, every 60 minutes. She cannot work in high concentrations of dust, fumes, and gases, or extremes of hot, cold, or high humidity. She cannot climb ladders, ropes, or scaffolds, and is limited to occasional stooping. She cannot work in an environment requiring production rate pace. She can occasionally interact with co-workers and the public. She is limited to occasional workplace changes.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on November 28, 1962 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.      The claimant has not been under a disability, as defined in the Social Security Act, from August 24, 2013, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 19-32.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the

Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at

* 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by

26

substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

**A.      First Assignment of Error: RFC**

In her first assignment of error, Henkel argues the RFC is not supported by substantial evidence.  (Doc. No. 13 at 17.)  She asserts the ALJ "never recognized that all of [her] medical treatment was provided through one institution/team of physicians or analyzed the record as a whole."  (*Id*. at 14.)  Henkel asserts the opinion provided by Dr. Jani was "not provided in

isolation; it was provided by [her] team of physicians yet never viewed by the ALJ as a whole or treated as opinions, from treating physicians, deserving of great weight." (*Id*. at 15.)  Henkel also contends the "treatment records from [her] medical team at MetroHealth contain significant functional restrictions that deserve deference." (*Id*.)

The Commissioner maintains the ALJ "properly considered the record as a whole" and "articulated appropriate bases for the weight given the evidence of record" when formulating the RFC. (Doc. No. 14 at 11.)  The Commissioner argues the ALJ "properly weighed Mr. Jani's opinion," as "Mr. Jani's treatment history is unclear . . . [as] the medical records do not show that Plaintiff ever saw Mr. Jani in any capacity." (*Id*. at 14.)  The Commissioner asserts Henkel "implies her team of medical providers issued medical opinions as part of their treatment notes." She argues, however, these treatment notes do not contain medical opinions, but rather, Henkel's subjective complaints.  (*Id*. at 14, 15.)

As Henkel makes two separate arguments regarding the formulation of the RFC, the Court will address each of these arguments in turn below.

### a. RFC/Consider the evidence as a whole

The ALJ is obligated to consider the record as a whole.  *Hurst v. Sec'y of H.H.S.*, 753 F.2d 517, 519 (6th Cir.1985).  It is essential for meaningful appellate review that the ALJ articulate reasons for crediting or rejecting particular sources of evidence.  *Morris v. Sec'y of H.H.S.*, No. 86–5875, 1988 WL 34109, at *2 (6th Cir. April 18, 1988).  Otherwise, the reviewing court is unable to discern "if significant probative evidence was not credited or simply ignored." *Id*. (citing *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir.1981)).  The ALJ need not provide a "written evaluation of every piece of testimony and evidence submitted.  However, a minimal

28

level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Id*. (quoting *Cotter*, 642 F.2d at 705).  An ALJ "cannot 'pick and choose' only the evidence that supports his position." *Kester v. Astrue*, No. 3:07cv00423, 2009 WL 275438, at *9 (S.D. Ohio Feb.3, 2009) (citing *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir.2000); *Switzer v. Heckler*, 742 F.2d 382, 385–86 (7th Cir.1984); *Kuleszo v. Barnhart*, 232 F.Supp.2d 44, 57 (S.D.N.Y.2002)).  However, an ALJ is not required to provide detailed evaluation of every piece of evidence contained within the record. Rather, the ALJ is charged with providing *minimal* articulation of their assessment of the evidence.  *See Morris,* 1988 WL 34109, at *2.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer v. Astrue*, 774 F.Supp.2d 875, 880 (N.D. Ohio 2011) (*citing Bryan v. Comm'r of Soc. Sec*., 383 Fed. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him."))*.  See also* SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 391 (6th Cir. 1999).

Here, at step two, the ALJ determined Henkel suffered from the severe impairments of

29

fibromyalgia, sarcoidosis, asthma, degenerative disc disease, osteoarthritis and allied disorders, obesity, neuropathy, affective disorders, and anxiety disorders.  (Tr. 20.)  After determining Henkel's impairments did not meet or equal a Listing, the ALJ went on at step four to consider the medical and opinion evidence.  (Tr. 20-30.)  The ALJ discussed Henkel's allegations, her treatment course, her consultative examination, and the objective findings.  (Tr. 23-30.)

> The ALJ formulated the following RFC:
>
> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she requires the ability to change positions briefly, that is one minute or less, every 60 minutes.  She cannot work in high concentrations of dust, fumes, and gases, or extremes of hot, cold, or high humidity.  She cannot climb ladders, ropes, or scaffolds, and is limited to occasional stooping.  She cannot work in an environment requiring production rate pace.  She can occasionally interact with co-workers and the public.  She is limited to occasional workplace changes.

(Tr. 23.)

The Court finds the ALJ properly discussed the evidence and made a clear connection between the RFC and her discussion.[7]  In the decision, the ALJ reviewed Henkel's allegations in detail, citing specific exhibits and testimony.  (Tr. 23-24.)  The ALJ contrasted these allegations with Henkel's ability to act as a caretaker for her son and mother, as well as the objective findings upon examination.  (Tr. 24.)  The ALJ cited these findings with specificity, noting full strength in Henkel's upper and lower extremities, a normal gait, and a normal pulmonary examination.  (*Id*.)  The ALJ noted Henkel indicated she used a cane or walker for ambulation but also reported she went dancing a few times a week for exercise.  (*Id*.)  The ALJ discussed

---

[7]     The Court notes Henkel, in her brief, focuses on the physical portion of her RFC. (*See* Doc. No. 13 at 14-17.)  This Court will similarly limit its analysis to the ALJ's RFC determination in the context of her physical impairments.

30

Henkel's 2012 MRI, her lumbar epidural steroid injections, and her pain management visits. (Tr. 24-27.) While the ALJ did not discuss each piece of evidence contained in the record, she was not required to do so.

Further, in support of the RFC, the ALJ acknowledged the consultative examiner opinion, the treating chiropractor opinion, and the treating source opinions contained in the record. (Tr. 27-30.) She noted the consultative examiner and the state agency physicians all limited Henkel to a range of light work and limited Henkel accordingly. (Tr. 23, 28-29.) In addition, the ALJ accounted for Henkel's pulmonary allegations in the RFC, limiting her exposure to pulmonary irritants. (Tr. 23.)

Substantial evidence supports the ALJ's conclusion. Henkel underwent back surgery in April 2011. (Tr. 303.) She reported worsening back pain in October 2012, and an MRI revealed an increase in the amount of soft tissue abutting the left S1 nerve root. (Tr. 336.) Henkel subsequently received five lumbar epidural steroid injections throughout 2013. (Tr. 383, 389, 405, 455, 591.) She reported good relief from these injections. (Tr. 414, 464.)

In January 2014, Henkel indicated increased back pain. (Tr. 474.) However, she had normal strength and sensation on examination, with only a mildly painful range of motion in the lumbar spine. (Tr. 475.) Henkel continued to report back pain to her treatment providers but her physical examination consistently revealed full strength in her upper and lower extremities. (Tr. 517, 571, 572, 736, 738, 800, 808.) She also indicated, on multiple occasions, she was walking and dancing for exercise. (Tr. 699, 719, 724, 809.) Henkel was not able to receive any additional epidural injections due to her poorly controlled diabetes. (Tr. 860.)

As for her sarcoidosis, Henkel indicated occasional shortness of breath but denied a

31

chronic cough.  (Tr. 742.)  She did not treat with a pulmonlogist during the relevant periodand a September 2014 pulmonary function test yielded normal results.  (Tr. 686, 780.)

Henkel argues the ALJ erred because she "never recognized that all of [her] medical treatment was provided through one institution," citing *Pater v. Comm'r of Soc. Sec.,* 2016 WL 3477220 (N.D. Ohio June 17, 2016).  (Doc. No. 13 at 14.)  While *Pater* recognizes many patients receive care from various treatment providers within one entity, it does not stand for the proposition that an ALJ is required to make clear all of a claimant's treatment providers were employed by the same health system.  *See Pater,* 2016 WL 3477220 at *6.  Henkel argues since her treatment took a "team approach" it required evaluation "as a whole."  (Doc. No. 13 at 14.)  However, a review of the ALJ decision indicates the ALJ did evaluate the evidence as a whole. The ALJ provided a seven-page discussion of the evidence, detailing the allegations, the objective findings, the MRI, the epidural injections, and each of the opinions contained in the record.  She did not "pick and choose" only the evidence which supported her position.  *See Kester,* 2009 WL 275438, at *9.

Accordingly, the Court finds this argument is without merit.

### b.   *Dr. Jani / Functional restrictions contained in treatment notes*

Henkel argues the opinion provided by Dr. Jani was "deserving of great weight," as "this information was not provided in isolation; it was provided by [her] team of physicians." (Doc. No. 13 at 15.)  She also maintains several treatment notes from her "medical team at MetroHealth contain significant functional restrictions that deserve deference."  (*Id.*)  Henkel asserts Dr. Jani's opinion and these treatment notes should have been considered in conjunction with each other, "as if from one source and given controlling weight."  (*Id.* at 16.)

32

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight."  *Id.*  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)."  *Id.*  In other words, "'the regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.'"  *Gayheart,* 710 F.3d at 375 (quoting Soc. Sec. Rul. No. 96–6p,[8] 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)).

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart,* 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2).[9]  However,  in order to be considered a treating source, the

---

[8]  SSR 96-6p has been rescinded and replaced by SSR 17-2p, effective March 27, 2017.  *See* Soc. Sec. Rul. No. 17-2p, 2017 WL 3928306 at *1 (Soc. Sec. Admin. Mar. 27, 2017).

[9] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

physician must have "an ongoing treatment relationship with" the claimant, and the frequency of treatment must be "consistent with accepted medical practice" for the claimant's condition. 20 C.F.R. §§ 404.1502 and 416.902. *See Reeves v. Comm'r of Soc. Sec.*, 618 Fed. App'x  267, 273 (6th Cir. July 13, 2015).

> Here, the ALJ discussed the opinion of "Dr. Geepu Cahli Jani" as follows:

> On February 2, 2016, Dr. Geepu CahLi Jani opined that the claimant could occasionally lift and/or carry 5 pounds (Ex. C13F/1).  She could stand and/or walk a total of 30 minutes per day.  She could sit a total of 1-2 hours per day.  She could rarely climb, balance, stoop, crouch, kneel, or crawl.  She could frequently perform fine and gross manipulation.  (Ex. C13F/2).  She could occasionally reach, pull or pull.[sic]  She had restrictions from heights, moving machinery, temperature extremes, and pulmonary irritants.  A cane, walker, brace, TENS unit and breathing machine had been prescribed.  She would need to alternate positions between sitting, standing, and walking at will.  She experienced severe pain, which would interfere with concentration, take her off-task, and cause absenteeism.  She needed to elevate her legs to 45 degrees.  Dr. Jani's treatment relationship with the claimant is not clear from the record.  I give little weight to this opinion as it appears to be based upon the claimant's own self-report.  Even if this physician had a treating relationship with the claimant, it is not entitled to controlling weight because of inconsistencies with the medical evidence as a whole.  The evidence in the record showed the claimant's own nurse practitioner stated that the claimant had 5/5 strength in all extremities (Ex. C3F/5).  She had +2 reflexes.  The consultative examiner noted that she ambulated with a normal gait, which was not unsteady, lurching, or unpredictable (Ex. C5F/4).  Her lung fields were clear without wheezes, rales or rhonchi.  She did not appear to be short of breath.  Her straight leg raise test in the sitting and supine position was normal (Ex. C5F/5).  She was able to stand on one leg at a time without difficulty.  She had some loss of motion of the dorsolumbar spine.  Her muscle strength was normal at 5/5 in all extremities.  There was no evidence of atrophy and her sensory modalities were well preserved including light touch, pinprick and vibration.  Her deep tendon reflexes were symmetrical and graded normally at +2/4 bilaterally.  She was able to walk on her heels and toes.  She was able to perform tandem gait without difficulty.

(Tr. 29-30.)

> For the following reasons, the Court finds Dr. Jani's opinion does not constitute a

34

treating source opinion and therefore is not entitled to controlling weight.  As noted *supra,* the identity of the individual who filled out a "Medical Source Statement: Patient's Physical Capacity" on February 2, 2016 is unclear, as the signature on the form is not legible.  (Tr. 853-854.)  The ALJ, Henkel and the Commissioner all refer to the individual completing this form as "Geepu Cahli Jani."  (*See* Doc. No. 13 at 10, Doc. No. 14 at 8, Tr. 29.)  Both the ALJ and Henkel assert Geepu Cahli Jani is a physician, while the Commissioner maintains it is unclear if Jani is an acceptable medical source as no credentials were provided on the form.  (*Id.*)

Assuming *arguendo* "Dr. Jani" is indeed an acceptable medical source, the evidence still does not establish the ongoing treatment relationship necessary to be considered a treating source.  *See* 20 C.F.R. §§ 404.1502 and 416.902.  *See Reeves*, 618 Fed. App'x at 273.  There are no treatment notes contained in the record from anyone named "Dr. Jani" and therefore, as the ALJ correctly noted, the treatment relationship between Dr. Jani and Henkel is unknown.

Henkel asserts Dr. Jani was a physician at MetroHealth, where she received the bulk of her medical care.  (Doc. No. 13 at 15.)   She argues this opinion was, therefore, provided by her entire team of physicians at MetroHealth.  (*Id.*)  The Court disagrees.  There is no evidence Dr. Jani was a physician at MetroHealth; there is no mention of a Dr. Jani in the MetroHealth medical evidence.  Moreover, there is no evidence this opinion represented the opinions of an entire medical team or that MetroHealth was using a "team approach" to Henkel's treatment.  There is also no indication the individual who signed this opinion had consulted with any of Henkel's other treating sources.  And most importantly, the record does not indicate Dr. Jani had actually treated Henkel, beyond a signature on the February 2016 form.  *See Borden v. Comm'r of Soc. Sec.,* 2014 WL 7335176 at *15, n. 2 (N.D. Ohio Dec. 19, 2014).

Because the record does not establish Dr. Jani was Henkel's treating physician, the ALJ was not required to determine whether this opinion was entitled to "controlling weight," or articulate "good reasons" for discounting it.  Moreover, as noted *supra*, the record before the ALJ did not include any treatment records from Dr. Jani.  In the absence of any actual medical records relating to Dr. Jani's treatment of Henkel, the Court finds the ALJ reasonably afforded Dr. Jani's opinion little weight.

Henkel also argues her treating physicians at MetroHealth provided "significant functional restrictions that deserve deference."  (Doc. No. 13 at 15.)  Henkel directs this Court to several treatment notes, in which her treatment providers noted increased pain with sitting, standing, lifting, and movement.  (*Id*. at 15-16.)  While Henkel's treatment providers did make notations Henkel's pain increased with certain activities, each of these notations were entered under the "Subjective" portion of the treatment note.  (*See* Tr. 370, 422, 464, 571, 713.)[10] Therefore, these "functional restrictions" are Henkel's subjective complaints, not medical opinions.  *See Francis v. Comm'r of Soc. Sec.,* 414 Fed. App'x 802, 804 (6th Cir. 2011)("Dr. Killefer's pain related statement . . . is not a "medical opinion" at all – it merely regurgitates Francis's self-described symptoms.)  Moreover, the ALJ accounted for this pain by limiting Henkel's standing, walking, and lifting abilities in the RFC.

The Court notes, however, that one of the treatment notations referenced by Henkel is

---

[10]     Henkel cites *Craddock v. Colvin,* 2015 WL 4664006 (N.D. Ohio Aug. 6, 2015), arguing this Court found a doctor's "sitting and standing ability in the impressions section of his notes were opinions and had to be analyzed accordingly."  (Doc. No. 13 at 15.)  However, here, unlike *Craddock*, the sitting and standing abilities are listed under the subjective portion of the treatment note, rather than the doctor's objective impressions.  *See Craddock,* 2015 WL 4664006 at *2.

36

not under the "Subjective" portion of a treatment note.  On January 10, 2013, Dr. Astley noted

Henkel "is sometimes using a walker or cane to ambulate and she is still working."  (Tr.374.)

The Court finds this is not a medical opinion.  Dr. Astley is not making a judgment Henkel must

use a cane or walker but rather is simply observing she "sometimes" uses one.[11]

Overall, Henkel's arguments regarding Dr. Jani and her MetroHealth treatment notes

have no merit.  While Henkel cites evidence from the record she believes supports a more

restrictive RFC, the findings of the ALJ "are not subject to reversal merely because there exists

in the record substantial evidence to support a different conclusion."  *Buxton v. Halter*, 246 F.3d

762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear that an ALJ's decision

"cannot be overturned if substantial evidence supports the claimant's position, so long as

substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc.*

*Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  In the instant case, the ALJ clearly articulated her

reasons for finding Henkel capable of performing work as set forth in the RFC and these reasons

are supported by substantial evidence.

Accordingly, Henkel's argument the ALJ erred in formulating the RFC is without merit.

**B.      Second Assignment of Error: Dr. Bukuts' opinion**

In her second assignment of error, Henkel argues the ALJ "incorrectly devalued the

opinion of [her] treating psychiatrist."  (Doc. No. 13 at 17.)  Henkel asserts the ALJ's

"conclusory statements" do not provide "clear and specific reasoning for detailing the weight

assigned to a treating physician."  (*Id.* at 19.)  She maintains the ALJ "did not address any of the

---

[11]      The Court further notes this January 10, 2013 office visit occurred nearly a year
         prior to the December 30, 2013 alleged onset date.

factors set forth" in the social security regulations, and concludes the ALJ "failed to offer any 'good reasons' as to why the doctor's opinion was not given great weight."  (*Id.* at 19, 20.)

The Commissioner asserts the ALJ properly considered Dr. Bukuts' opinion.  (Doc. No. 14 at 15.)  She maintains the ALJ did consider the factors set forth in the social security regulations.  (*Id*. at 16.)  The Commissioner argues the treatment records do not support the limitations provided by Dr. Bukuts, therefore, the "ALJ properly evaluated Dr. Bukuts' opinion and gave it little weight."  (*Id*.)

As noted *supra*, a treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec*., 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2). However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."[12] *Blakley*, 581 F.3d at 408.  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not

---

[12]    Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id*., as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 242 (6th Cir. 2007).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.[13]

---

[13]  "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'  The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling.  20 C.F.R. § 404.1527(c).  Other factors 'which tend to support or contradict the opinion' may be

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley,* 581 F.3d at 406.  Moreover, the "treating physician rule" only applies to *medical opinions*.  "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors— [the ALJ] decision need only 'explain the consideration given to the treating source's opinion.'"  *Johnson v. Comm'r of Soc. Sec.*, 535 Fed. App'x 498, 505 (6th Cir. 2013). The opinion, however, "is not entitled to any particular weight."  *Turner*, 381 Fed. App'x at 493. *See also Curler v. Comm'r of Soc. Sec.,* 561 Fed. App'x 464, 471 (6th Cir. 2014).

Here, the ALJ thoroughly recounted and analyzed the medical evidence regarding Henkel's mental health diagnoses, psychological consultative examination, and treatment.  (Tr. 21-22, 24-29.)  The ALJ went on to discuss the opinion of Dr. Bukuts as follows:

> On February 8, 2016, Dr. James Buktus[sic] completed a form that stated the claimant could occasionally do the following: follow work rules, use judgment, respond appropriately to changes in [routine] settings, maintain regular attendance and be punctual within customary tolerance, function independently without direction, work in coordination with or proximity to others without being distracted, deal with work stress, and complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods (Ex. C14F/1).  She could occasionally understand, remember, and carry out simple job instructions.  (Ex. C14F/2). She could occasionally socialize and relate predictably in social situations. Pursuant to 20 CFR 404.1527/416.927, if a treating source opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the

---

considered in assessing any type of medical opinion.  *Id.*  § 404.1527(c)(6)."  *Gayheart*, 710 F.3d at 376.

record, we will accord the opinion controlling weight.  In this case, upon consideration of the evidence, I find Dr. Buktus's[sic] opinion is unsupported and inconsistent with the record as a whole.  Specifically, Dr. Buktus's[sic] opinion appears to be an overstatement of the claimant's limitations based upon her own subjective complaints.  I gave partial weight to this opinion to the extent that it is consistent with the residual functional capacity findings above.  However, the claimant's own reported activities of daily living, including going dancing and involvement with her church demonstrate that she has greater abilities.

(Tr. 30.)

As an initial matter, the Court is not convinced Dr. Bukuts is a treating source. The

Commissioner correctly notes Dr. Bukuts treated Henkel once, a year prior to rendering his

opinion, and suggests he may not be a treating physician.  (Doc. No. 14 at 16.)   A review of the

medical evidence confirms Dr. Bukuts saw Henkel on February 25, 2015 and renewed her

medications on December 11, 2015.  (Tr. 705, 758.)  This one time encounter does not establish

the ongoing treatment relationship necessary to be considered a treating source.[14]  Indeed,

precedent in this Circuit suggests a physician who treats an individual two or three times does not

constitute a treating source.  *See Smith*, 482 F.3d at 876.  *See also Punches v. Comm'r of Soc.*

*Sec.,* 2013 WL 3992593 at *3 (N.D. Ohio Aug. 5, 2013) ("The case law is clear that one

examination is generally not sufficient to establish an ongoing relationship at the time of that

examination."); *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x  496,  506–07 (6th Cir. 2006)

("Depending on the circumstances and the nature of the alleged condition, two or three visits

---

[14]    The Court notes a consultative examiner, who also only sees a claimant for a one-time examination, is not entitled to controlling weight or deference. Moreover, even if an ALJ's RFC deviates in some respects from a consultative examiner's opinion, this does not require reversal.  *See Dykes,* 112 Fed. App'x at 468 ("the ALJ's failure in the present case to explain why he disregarded part of the opinion of the consultative examiner does not warrant remand.").

often will not suffice for an ongoing treatment relationship"); *Kepke v. Comm'r of Soc. Sec.*, 636 Fed. App'x 625, 629 (6th Cir. 2016) ("It was not improper for the ALJ to discount Dr. Chapman's opinion on the basis that he treated Kepke only three times over a three month period).

However, if Dr. Bukuts is a treating source, the Court first notes the RFC adopted (or was not inconsistent with) many of the functional limitations assessed by Dr. Bukuts in his February 2016 opinion.[15]   The RFC conflicts, however, with Dr. Bukuts' opinion Henkel could only occasionally (1) follow work rules, (2) use judgment, (3) maintain regular attendance and be punctual within customary tolerance, (4) function independently without redirection, (5) complete a normal workday or work week without psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, (6) understand, remember, and carry out simple, detailed, and complex job instructions, and (7) manage funds/schedules.  (Tr. 855-856.)

The Court finds the ALJ properly evaluated Dr. Bukuts' opinion.  In assigning "partial weight" to Dr. Bukuts' opinion, the ALJ addressed the consistency and supportability of the opinion, citing the opinion's inconsistency with the medical evidence and the appearance it was "an overstatement" of Henkel's mental limitations.  (Tr. 30.)  The ALJ then specifically noted

---

[15]     Specifically, Dr. Bukuts found Henkel could occasionally respond appropriately to changes in routine settings, frequently relate to co-workers, frequently interact with supervisors, occasionally work in coordination with or proximity to others without being distracted, frequently work in coordination with or proximity to others without being distracting, occasionally deal with work stress, occasionally socialize, and occasionally relate predictably in social situations.  (Tr. 855-856.) In the RFC, the ALJ found Henkel could "not work in an environment requiring production rate pace.  She can occasionally interact with co-workers and the public.  She is limited to occasional workplace changes."  (Tr. 23.)

42

Henkel's "own reported activities of daily living, including going dancing and involvement with her church demonstrate that she has greater abilities." (*Id.*)

The Court agrees that taken alone, it would be questionable whether these statements satisfy the "good reasons" requirement of the treating physician rule. However, reviewing the ALJ decision in toto this Court believes the ALJ thoroughly evaluated the evidence.

Specifically, the ALJ discussed Henkel's allegations regarding her bipolar disorder, anxiety, depression, poor sleep, and diminished concentration. (Tr. 23-24.) The ALJ acknowledged Henkel's reports that she required assistance with most tasks, including shopping and household chores. (Tr. 24.) The ALJ noted correctly, however, Henkel consistently reported she was a caretaker for both her son and mother. (Tr. 24, 25, 26.) The ALJ also discussed Henkel's reported daily activities earlier in the decision, including her involvement with her church, and her abilities to drive, play the flute, study, and maintain friendships. (Tr. 21, 22.)

The ALJ also discussed and reviewed Henkel's mental health treatment notes. (Tr. 24-27.) The ALJ noted Henkel's reports of severe anxiety around others, as well as depression over her son's mental health condition. (Tr. 25.) She reviewed Henkel's psychological consultative examination and the GAF score of 55, indicating moderate symptoms. (Tr. 26.) She noted Henkel had never experienced an episode of decompensation. (Tr. 22.) The ALJ reviewed the state agency physician opinions, who had found mild to moderate limitations. (Tr. 29.)

Even if the ALJ had discussed this evidence immediately after weighing Dr. Bukuts' opinion, it is clear the ALJ provided "good reasons" for affording it less than controlling weight. Remand is not required where an ALJ did not analyze the medical evidence for a second time when assessing an opinion. *See e.g., Ellis v. Comm'r of Soc. Sec.*, 2015 WL 6444319 at * 15-16

43

(N.D. Ohio Oct. 23, 2015); *Hanft v. Comm'r of Soc. Sec.*, 2015 WL 5896058 at * 9 (N.D. Ohio Oct. 8, 2015); *Daniels v. Comm'r of Soc. Sec.*, 2014 WL 1304940 at * 4 (N.D. Ohio March 27, 2014) ("There is no magic language that an ALJ must use to show that he or she has considered the factors in 20 CFR § 404.1527.  Rather, the ALJ must set forth his or her supporting reasoning, based on evidence in the record, to allow for meaningful judicial review.")  "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)).  *See also Kobetic v. Comm'r of Soc. Sec.*, 114 Fed. App'x 171, 173 (6th Cir. 2004 ) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (quoting *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766, n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) ).

Henkel argues the ALJ "did not address any of the factors set forth in [20 CFR §]404.1527."  (Doc. No. 13 at 19.)[16]  The Court disagrees.  The ALJ specifically noted the supportability and consistency of Dr. Bukuts' opinion, two of the factors listed at 20 CFR §1527(c).  (*See* Tr. 30.)  Furthermore, while the ALJ is charged with considering the factors set forth at 20 CFR §1527(c) when evaluating medical opinion evidence, the ALJ is not required to

---

[16]  As noted *supra*, when not assigning controlling weight to a treating physician's opinion, the ALJ should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.  *See* 20 CFR §1527(c).

articulate specific findings as to each of these factors.  Indeed, neither the regulations or Sixth Circuit case law requires an "exhaustive factor-by-factor analysis."  *Francis,* 414 Fed. App'x at 804.

Further, substantial evidence supports the ALJ's decision to afford Dr. Bukuts' opinion less than controlling weight.  Henkel initially visited the Centers for Families and Children, where Dr. Bukuts practiced, in January 2013.  (Tr. 539.)  She reported depression and multiple stressors.  (Tr. 539, 544.)  Henkel re-started her psychiatric medications and began to attend medication management appointments every few months.  (Tr. 544, 551, 553.)  By July 2013, her situational mood swings had improved, and in October 2013, her depression and anxiety were stable.  (Tr. 558, 560.)  In March 2014, Henkel was "doing well," with no issues or concerns. (Tr. 563.)

Henkel did experience an uptick in mental health symptoms in June 2014, due to her son's mental health condition.  (Tr. 565.)  She subsequently received a temporary increase in her Ativan and Zoloft.  (Tr. 566.)  In August 2014, Henkel indicated her mood was stable, her anxiety was mild, and she was able to help care for her aging mother.  (Tr. 697.)  Henkel did report increased depression and anxiety in November 2014, indicating she was "burned out" from caring for others.  (Tr. 699.)

Henkel continued to visit the Centers for Families and Children every few months in 2015.  Her treatment notes reveal she was compliant with medications, with no acute concerns. (Tr. 762, 765.)  In February 2015, she was focused on obtaining ADHD medications but Dr. Bukuts encouraged her to address her anxiety first.  (Tr. 705, 706.)  By October 2015, her anxiety had improved and she was sleeping well most nights.  (Tr. 765.)

In sum, the ALJ acknowledged Dr. Bukuts' opinion and articulated reasons for discounting it, including its supportability and consistency with the other evidence in the record. Since the ALJ had already reviewed the evidence at length in her decision, the justification for these reasons was clear. This provides a sufficient basis for the ALJ's rejection of Dr. Bukuts' opinion, and affords this Court the opportunity for meaningful review. *See Nelson v. Comm'r of Soc. Sec.,* 195 Fed. App'x 462, 472 (6th Cir. 2006) ("The ALJ implicitly provided sufficient reasons for not giving those opinions controlling weight.").

For the reasons set forth above, the Court finds the ALJ properly evaluated Dr. Bukuts' opinion. Accordingly, Henkel's second assignment of error is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: April 10, 2018

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**